IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIPING ROCK PARTNERS, INC., and CHRISTOPHER K. GERMAIN,<br><br>    Plaintiff,<br><br>   v.<br><br>DAVID LERNER ASSOCIATES, INC., DAVID LERNER, and GEORGE DOBBS,<br><br>    Defendants.<br>_____ / | No. C 12-04634 SI<br><br>**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS** |

Plaintiffs Chris Germain ("Germain") and Piping Rock Partners, Inc. ("Piping Rock") have filed suit against David Lerner Associates, Inc. ("DLA") and two individuals, DLA's president David Lerner ("Lerner") and former DLA employee George Dobbs ("Dobbs"), for libel and tortious interference with contract under California law. Now before the Court are separate motions by defendants DLA and Lerner, and defendant Dobbs, to dismiss plaintiffs' first amended complaint ("FAC") for lack of personal jurisdiction. Plaintiffs have opposed both motions, and both sets of defendants have replied. On November 2, 2012, the Court held a hearing on the motions. Having considered the parties' arguments, the Court hereby DENIES both motions to dismiss, as set forth below. Dkt. Nos. 13, 14.

**BACKGROUND**

**1. The Parties.**

Plaintiff Chris Germain, a California citizen, is the sole shareholder of plaintiff Piping Rock Partners, Inc., a California corporation that specializes in the acquisition and management of real estate for investment purposes. FAC ¶¶ 11-12, 30-31. Piping Rock's primary place of business is San Francisco, California. *Id.* ¶ 11; Germain Decl. ¶ 3. More than fifty percent of the total equity capital invested in Piping Rock's managed investments has originated from California residents and more than thirty percent of the debt funding for Piping Rock's managed investments has been sourced through California residents. Germain Decl. ¶ 3. Germain is also the founder of "REIT Wrecks," a blog he started in 2008, on which he discusses real estate investment trusts ("REIT"). FAC ¶ 37.

Defendant David Lerner, a New York citizen, is the president and controlling owner of defendant David Lerner Associates, Inc., a privately-held brokerage firm incorporated in New York that sells security interests in REITs and other investment products. Lerner Decl. ¶¶ 1-2. DLA's primary place of business is Syosset, New York. *Id.* ¶ 3. DLA does not have any offices located in California, does not have a registered agent in California, is not registered to do business in California with the California Secretary of State, does not own or lease any property in California, does not pay taxes in California, and has never entered into a contract in California. *Id.* ¶ 4. However, approximately 0.7% of DLA's customers live in California. *Id.* ¶ 5. Lerner contends that DLA has never advertised in California, Lerner Decl. ¶ 5, but Germain alleges that it has and produces several DLA advertisements in California publications, Germain Decl. ¶ 4, Exs. A-D; *see also* Germain Decl. Exs. E-F (additional DLA advertisements in California). Germain also contends that DLA and at least ninety-two of the brokers employed by DLA are registered to sell securities in California, including Lerner himself. Germain Decl. ¶ 7, Ex. G. Lerner is also the chairman, president, and a director of the Spirit of America Tax-Free Bond Fund, which holds $6 million in California bonds. *Id.* ¶ 8.

Defendant George Dobbs, a citizen of New Jersey, was an employee of DLA, where he worked as a registered securities broker from August 2003 to June 2012. Dobbs Decl. ¶¶ 5, 12. Though Dobbs claims to have no regular connections with California, two of his DLA clients became California

2

residents, and sometime after those clients moved to California, Dobbs became licensed to sell securities in California. *Id.* ¶ 11. Dobbs is no longer licensed to sell securities in California. *Id.*

## 2. The Underlying Factual Allegations.

In January 2010, Germain launched a public forum on his blog REIT Wrecks to encourage discussion of non-traded REITs. FAC ¶ 48. In response to a reader's post about DLA and Lerner, Germain posted a reply explaining that DLA and Lerner appeared to be violating a regulation promulgated by the Financial Industry Regulatory Authority (FINRA). *Id.* ¶¶ 13, 50. On May 27, 2011, after months of increasing publicity – including an article in Bloomberg discussing non-publicly traded REITs and identifying Germain and REIT Wrecks by name (*Id.* ¶ 51), and a blog posting exchange between the Chief Compliance Officer for DLA and Germain – FINRA filed a formal complaint against DLA, alleging various improprieties in connection with the non-traded REITs that DLA managed. *Id.* ¶ 59. In addition, two class actions were filed against DLA. *Id.* ¶¶ 66, 68.

Plaintiffs allege that from June 23 to June 29, 2011, defendants conducted a retaliatory online "smear campaign" against Germain, Piping Rock, and the two law offices that filed the class action suits against DLA. FAC ¶ 70. The smear campaign included nineteen allegedly libelous posts on various consumer-report websites, including eight identical posts directed at Germain and Piping Rock. *Id.* ¶ 71. The author of the posts accused plaintiffs of dishonesty and fraud in their investment strategies. *Id.* ¶ 134-35, Exs. DD- KK. Several of the posts identify plaintiffs by name, address, and telephone number in San Francisco, California. *Id*. ¶¶ 129-33. At least five people in California viewed one of the posts. Germain Decl. ¶ 19.

Plaintiffs further contend that defendants' retaliation extended to an attack on Germain's brother, who is not a party to this suit. Germain's brother was a limited partner in two investments sponsored by Piping Rock and was a member of Piping Rock's board of directors. FAC ¶ 156. He provided Germain and Piping Rock with advice and business counsel. *Id.* ¶ 157. Plaintiffs allege that an unidentified Doe defendant contacted FINRA regarding Germain's twin brother's involvement with Piping Rock with the intent of disrupting the contractual relationship between them, but plaintiffs do not specify what the communication entailed. *See id.* ¶ 160. On February 29, 2012, allegedly as the

3

result of the Doe defendant's communication to FINRA, Germain's brother resigned from his position on Piping Rock's board of directors and severed all ties with the company. *Id.* ¶ 161.

**3.    Defendants' 12(b)(2) Motions to Dismiss for Lack of Personal Jurisdiction.**

On April 9, 2012, plaintiffs filed a complaint against John Doe Nos. 1-6 in the Superior Court of California for the County of San Francisco, alleging libel and intentional interference with contractual relations under California law. Pls.' Dobbs Opp. 3. On June 25, 2012, plaintiffs filed a first amended complaint, and later on July 17 and July 23, 2012, plaintiffs filed amendments to the first amended complaint naming Dobbs, Lerner, DLA, and John Doe Nos. 1-7 as defendants. *Id.* at 4. On September 5, 2012, DLA and Lerner removed the action to federal court. Dkt. 1. On September 11, 2012, DLA and Lerner filed a motion to dismiss for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). Dkt. 7. The following day, Dobbs also filed a motion to dismiss for lack of specific personal jurisdiction. Dkt. 13.

Plaintiffs contend that this Court has specific jurisdiction over Dobbs because his allegedly tortious conduct individually targeted plaintiffs in the forum state. Dobbs does not deny authoring three of the internet posts at issue, but instead disputes that the posts were expressly aimed at California. Plaintiffs contend that this Court has specific jurisdiction over DLA and Lerner because they are liable for the allegedly tortious actions of Dobbs and the remaining Doe defendants under traditional agency principles. Alternatively, plaintiffs argue that this Court has general jurisdiction over DLA and Lerner because their contacts with the forum approximate physical presence in California. DLA and Lerner deny authorizing Dobbs' actions and dispute that they have sufficient material contacts with California such that general or specific jurisdiction would be proper.

**LEGAL STANDARD**

Personal jurisdiction over a non-resident defendant may exist if the defendant has either a continuous and systematic presence in the state (general jurisdiction), or minimum contacts with the forum state such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice" (specific jurisdiction). *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)

4

(citation omitted). Where there is no federal statute applicable to determine personal jurisdiction, a district court should apply the law of the state where the court sits. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). California law requires only that the exercise of personal jurisdiction comply with federal due process requirements. *See id.* at 800-01.

"A defendant whose contacts with a state are 'substantial' or 'continuous and systematic' can be haled into court in that state in any action, even if the action is unrelated to those contacts." *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984)). "This is known as general jurisdiction. The standard for establishing general jurisdiction is fairly high and requires that the defendant's contacts be of the sort that approximate physical presence." *Id.* (citations omitted). "Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Id.*

In order for a court to exert specific jurisdiction in accordance with due process, a nonresident defendant must have "'minimum contacts' with the forum state such that the assertion of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (quoting *Int'l Shoe*, 326 U.S. at 315). The Ninth Circuit employs a three-part test to determine whether the defendant has such minimum contacts with a forum state. First, the "nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum," thereby invoking the benefits and protections of the forum state. *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997) (quoting *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1998)). Second, the claim must "arise[] out of or result[] from the defendant's forum-related activities," and third, the exercise of personal jurisdiction over the defendant must be reasonable. *Pebble Beach Co.*, 453 F.3d at 1155. The plaintiff bears the burden of proving the first two conditions. *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). If the plaintiff carries this burden, "the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (citing *Schwarzenegger*, 374 F.3d at 802).

5

If a district court acts on the defendant's motion to dismiss without holding an evidentiary hearing, the plaintiff "need only demonstrate facts that if true would support jurisdiction over the defendant." *Id.* at 1129 (citation omitted). Unless directly contravened, the plaintiff's version of the facts is taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of deciding whether a prima facie case for personal jurisdiction exists. *Id.* (citation omitted); *see also Bancroft*, 223 F.3d at 1087.

## DISCUSSION

### I. Defendant Dobbs' Motion to Dismiss for Lack of Personal Jurisdiction.

#### A. Purposeful Direction.

To exercise specific as opposed to general personal jurisdiction, the Court must first find that Dobbs purposefully directed his conduct at California. In particular, the "nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum," thereby invoking the benefits and protections of the forum state. *Cybersell,* 130 F.3d at 418. However, "A purposeful direction analysis...is most often used in suits sounding in tort," whereas purposeful availment applies to suits in contract. *Schwarzenegger*, 374 F.3d at 802 (internal citations omitted). To determine whether purposeful direction exists, the Ninth Circuit applies a three-part "effects test" derived from *Calder v. Jones*, 465 U.S. 783 (1984): "the defendant allegedly must have (a) committed an intentional act, (b) expressly aimed at the forum state, (c) causing harm that the defendant knows is likely to be suffered in the forum state." *Fiore*, 688 F.3d at 576 (internal quotations omitted).

#### 1. Intentional Act.

A plaintiff properly alleges an intentional act when the plaintiff identifies "an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806. There can be no doubt that plaintiffs' undisputed allegation that Dobbs published at least three libelous internet postings is sufficient to show an intentional act. *See* FAC ¶¶ 79-81.

### 2. Express Aiming.

The crux of Dobbs' motion is that plaintiffs have not demonstrated that his internet postings satisfy the "express aiming" requirement articulated in *Calder*. The Ninth Circuit has held that, "[the express aiming] requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Bancroft*, 223 F.3d at 1087. In tort cases in particular, where specific jurisdiction is properly exercised despite the non-resident's absence of physical presence in the forum state, there must be "individualized targeting." *Id.* at 1088. What constitutes individualized targeting has varied from case to case, but subsequent Ninth Circuit case law has made clear that where a defendant's alleged conduct intentionally and specifically targets the plaintiff *and* his or her activities in the forum state, the exercise of specific jurisdiction is consistent with *Calder*. *See Fiore*, 688 F.3d at 577-78 (express aiming inquiry turns on whether the "intended impact [] is either local or undifferentiated" or "an intended impact that is targeted at a known individual who has a substantial, ongoing connection to the forum"); *see also Brayton Purcell v. Recordon & Recordon*, 606 F.3d 1124, 1129-30 (9th Cir. 2010) (holding that the out-of-district defendant's alleged infringement of the plaintiff's internet-based materials that put it in direct competition with the plaintiff's business constituted express aiming); *cf. Schwarzenegger*, 374 F.3d at 807 (holding that the Ohio defendant's unauthorized use of the California plaintiff's likeness in local Ohio advertisements did not constitute express aiming, because the "express aim was local").

Taking plaintiffs' factual allegations as true, the Court concludes that Dobbs' conduct was expressly aimed at the forum state because it individually targeted plaintiffs and their professional activities in California, the undisputed locus of plaintiffs' business operations. The three posts that plaintiffs attribute to Dobbs singled out Germain in his capacity as president of Piping Rock and indicted his professional reputation, his company, and its employees. FAC ¶¶ 71, 131-35, Exs. DD- KK. It is reasonable to infer that the author of the posts knew that plaintiffs were residents of California, as evidenced by the fact that the titles or subheads of the posts contained the words "San Francisco, California" and included the mailing address and telephone number of Piping Rock in San Francisco. FAC ¶¶ 129-30; *see Fiore*, 688 F.3d at 575; *Bancroft*, 223 F.3d at 1087. The explicit identification and flagging of the forum state also makes it reasonable to infer that the posts were "expressly calculated

7

to cause injury in California" by directing anyone who searched for plaintiffs on the internet to the posts. *See Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d at 1198. Furthermore, plaintiffs have provided evidence that California readers actually viewed the allegedly libelous posts. Germain Decl. ¶ 19. As such, the intended and actual audience of the posts were in California, demonstrating that the express aim of the posts was not either "local or undifferentiated," but targeted at plaintiffs and their professional activities in the forum state. *See Fiore*, 688 F.3d at 577-78; *Brayton Purcell*, 606 F.3d at 1129-30; *cf. Schwarzenegger*, 374 F.3d at 807.

The authorities cited by Dobbs compel no different result. In *Continental Appliances, Inc. v. Thomas*, No. C-12-1310-EMC, 2012 WL 3646887, at *5 (N.D.Cal. Aug. 23, 2012), the court held that, where the plaintiff is a corporation, express aiming is not present if the plaintiff only alleges that the defendant has committed an intentional tort over the internet with knowledge that the plaintiff resides in the forum state. Without "additional considerations," such as allegations that the defendant targeted a forum-state audience or that the corporate plaintiff had its primary place of business in the forum state, the court was unwilling to find express aiming. *Id.* At hearing, defendants' counsel also suggested that where the initial contact with the forum is over the internet, the "additional considerations" must be extra-internet, such as letters or phone calls into the forum. The Ninth Circuit has not addressed defendants' reading of *Continental Appliances* that "additional considerations" are required in these circumstances. Moreover, the Court is skeptical of defendants' view that internet defamation torts cannot on their own target a forum state, without some extra-internet targeting. It is true that the mere act of using of the internet to defame a target has the potential to lead to expanded jurisdiction. However, here the *content* of the postings, not merely the *act* of posting, evidences express aiming. Whether or not the Ninth Circuit would require "additional considerations," they are present here where the author of the posts expressly aimed them at California by including "San Francisco, California" in the titles or subheads of the posts, as well as the mailing address of plaintiffs in San Francisco and their local phone number with the area code.

Dobbs' reliance on *Xcentric Ventures LLC v. Bird*, 683 F.2d 1068 (D. Ariz. 2010), is similarly misplaced. In that case, the defendants allegedly published an article on a website that defamed plaintiffs. *Id.* at 1070. While the court assumed, *arguendo*, that defendants had knowledge of the

8

plaintiffs' residence in the forum state, it found the fact that the plaintiffs did not allege that the defendants targeted the forum state in any capacity with the content of the internet post was dispositive. *Id.* at 1075. Here, the posts were more than just attacks on plaintiffs, but attacks on their professional activities in the forum state, targeted at actual and potential clientele on consumer-report websites.

### 3. Foreseeable Harm.

Plaintiffs have also met their burden of showing that Dobbs anticipated that his conduct would cause plaintiffs to suffer harm in the forum state. As stated above, it is reasonable to infer that Dobbs knew that plaintiffs' residence and their primary place of business was in California. As such, it is entirely foreseeable that harm from the postings could have occurred in California.

### B. Relation to Defendants' Forum-Related Activities and Reasonableness of Exercising Personal Jurisdiction.

Plaintiffs' libel claim arises directly out of Dobbs' contacts with the forum – his libelous internet postings. *See Schwarzenegger*, 374 F.3d at 802. Further, Dobbs fails to make a "compelling case" that the exercise of personal jurisdiction over him would be so unreasonable as to amount to a violation of due process. *Id.* Dobbs purposefully interjected himself into the forum by expressly aiming his internet posts at plaintiffs in the forum. Although there would undoubtedly be some burden on Dobbs of litigating in California, as he is not a California resident, "there would be a comparable burden on [plaintiff] to litigate," in Dobbs' alternative venue, New York or New Jersey. *Continental Appliances*, 2012 WL 364887, at * 8. Similarly, witnesses and documents are just as likely to be in the New York and New Jersey area, as they are to be in California. Moreover, California has an interest in providing its residents who claim tortious injury a proper means of redress and therefore this factor weighs in favor of personal jurisdiction. Taking these factors together, the Court finds that it would not be unreasonable to exercise personal jurisdiction over Dobbs.

///

9

## II. Defendants DLA and Lerner's Motion to Dismiss for Lack of Personal Jurisdiction

As a threshold matter, defendants DLA and Lerner assert that when a non-resident defendant moves to dismiss, the plaintiff must prove jurisdictional facts by a preponderance of evidence. Mot. to Dis. at 3. The Court disagrees. Federal courts sitting in diversity apply federal procedural law and state substantive law. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). And on a motion to dismiss, the Ninth Circuit requires that plaintiff make only "a prima facie showing of jurisdictional facts to withstand a motion to dismiss." *Brayton Purcell LLP*, 606 F.3d at 1127.

### A. Personal Jurisdiction based on agency theory. [1]

#### 1. Libel.

To find personal jurisdiction over DLA and Lerner, the Court must find that the defendants purposefully directed their conduct at California because "the defendant[s] allegedly must have (a) committed an intentional act, (b) expressly aimed at the forum state, (c) causing harm that the defendant knows is likely to be suffered in the forum state." *Fiore*, 688 F.3d at 576 (internal quotations omitted). To support the libel claim, plaintiffs argue that their allegation that Dobbs participated in his employer's smear campaign (FAC ¶ 26, 27) satisfies the intentional act prong because as principals, DLA and Lerner are responsible for the actions of their agent. Similarly, plaintiffs argue that their allegation that DLA and Lerner directed Dobbs (FAC ¶ 25-27) to participate in the smear campaign satisfies the intentional act prong because employers are liable for the actions of the employees under traditional *respondeat superior* principles. Moreover, even if DLA and Lerner did not direct Dobbs, plaintiffs allege that DLA and Lerner ratified his behavior afterward. FAC ¶ 108. DLA and Lerner, however, deny having made the internet postings or having directed anyone to make them. Lerner Decl. ¶ 7-8.

"For purposes of personal jurisdiction, the actions of the agent are attributable to the principal." *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990). The Court's jurisdiction over an agent imputes to the principal when the agent's conduct, on behalf of the principal, gives rise to the cause of action.

---

[1] Although DLA and Lerner dispute whether the Court can exercise general jurisdiction over them, the Court need not address general jurisdiction, which has an "exacting standard," Schwarzenegger, 374 F.3d at 801, because the Court finds that specific jurisdiction exists over DLA and Lerner.

*See Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 414 (9th Cir.1977). On a vicarious liability theory, minimum contacts of nonresident employer's agent are normally imputed to the employer. *College Source, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1078 (9th Cir. 2011). As in vicarious liability, an agent is considered to have acted on behalf of the principal. *Theo. H. Davies & Co. v. Republic of the Marshall Islands,* 174 F.3d 969, 974 (9th Cir.1998) ("In determining the sufficiency of a defendant's contacts, it is not only defendant's activities in the forum, but also actions relevant to the transaction by an agent on defendant's behalf, which support personal jurisdiction." (quotations omitted). Agency, in this context, is determined by the state law of the forum. *See Ochoa v. J.B. Martin & Sons Farms,* 287 F .3d 1182, 1189 (9th Cir. 2002). Under California law, "[a]n agent is one who acts on the principal's behalf and subject to the principal's control." *U.S. v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010) (applying California agency law); *see also* Restatement (Third) Agency § 1.01. When determining whether an employee is an agent, a court will look to the totality of the circumstances, but the "essential ingredient…is the extent of control exercised by the employer." *Bonds*, 608 F.3d at 505 (citing *NLRB v. Friendly Cab Co., Inc.,* 512 F.3d at 1096 (9th Cir. 2008).

DLA and Lerner dispute both the principal-agent theory and the *respondeat superior* theory as a basis for personal jurisdiction by denying that Dobbs' internet postings were either directed by them or part of a larger scheme they coordinated. Lerner Decl. ¶ 7-8. More generally, defendants argue that there can be no *respondeat superior* or principal-agent liability where the agent or employee acts outside the scope of his employment. *See Rivera v. Nat'l Railroad Passenger Corp.*, 331 F.3d 1074, 1080 (9th Cir. 2003). In particular, defendants note that several of the Dobbs' internet postings came from his home computer (Def's. Rep. at 7) and that DLA's Written Supervisory Procedures prohibits postings on such websites. Lerner Decl. ¶ 5-6. Allegations in plaintiffs' FAC plainly contradict defendants' denials. *See* FAC ¶ 4 ("DLA and David Lerner…directed John Does 1-6 to conduct a vicious, false and anonymous character assassination of Plaintiffs.); *see also* id. ¶ 5 ("DLA caused the online publication…of no fewer than eight (8) libelous postings about Germain and Piping Rock.").

Plaintiffs' core allegation is that Dobbs made the postings "in orchestration with, and for the benefit of and/or at the behest of Lerner and DLA." Pl. Opp. At 8. Whether defamation is outside the scope of Dobbs' ordinary employment duties is therefore of no consequence. Intentional torts would

11

1 rarely, if ever, be within the scope of an employees ordinary duties. The focus on a motion to dismiss
2 for lack of personal jurisdiction, however, is on whether plaintiff has made sufficient allegations. Here,
3 it is not disputed that Dobbs was an employee of DLA. Dobbs himself does not deny or rebut the
4 allegation that he was acting on DLA and Lerner's behalf or at their direction. *See* Dobbs Decl.
5 Therefore, the core dispute is between plaintiffs' FAC allegations and defendants DLA and Lerner's
6 affidavits denying that Dobbs was acting on their behalf or at their direction.

7 Allegations in a verified complaint are entitled to the same weight as averments in an affidavit.
8 *Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir. 1985). While admittedly there is a dispute here
9 between plaintiffs' complaint and DLA and Lerner's affidavits, "conflicts between the facts contained
10 in the parties' affidavits must be resolved in [plaintiff's] favor for purposes of deciding whether a prima
11 facie case for personal jurisdiction exists." *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001). Plaintiff
12 is entitled to this truthful inference, "[u]nless directly contravened." *Harris Rutsky & Co. Ins. Services,*
13 *Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003). Moreover, just as "[m]ere allegations
14 of the complaint, when contradicted by affidavits" are not enough to confer personal jurisdiction, *Taylor*
15 *v. Portland Paramount Corp.*, 383 F.2d 634, 639 (9th Cir. 1967), a "conclusory denial" does not rebut
16 a complaint's allegation such that it defeats personal jurisdiction, *Brayton Purcell*, 606 F.3d at 1129.
17 Where there are disputed allegations, "facts...must be the touchstone." *Taylor*, 383 F.2d at 639.

18 Insofar as plaintiffs allege that Dobbs was acting on behalf of or at the direction of his employer
19 or principal, the Court finds that plaintiffs' allegations give rise to personal jurisdiction over DLA and
20 Lerner. Although defendants' sworn affidavits conflict with plaintiffs' FAC, defendants' affidavits do
21 not *contravene* the allegations in plaintiffs' FAC. Defendants' affidavits are not supported by
22 contravening evidence or factual assertions demonstrating that the allegations, made by plaintiffs "upon
23 information and belief," that DLA and Lerner "conspired with" or were principals or employers on
24 whose behalf the posts were made, are demonstrably false.[2] At most, defendants' affidavits contain only
25 conclusory denials. Lerner Decl. ¶ 7-8, Lerner Decl. II ¶ 7 (Dkt. 28-2). Because these conclusory
26 denials are insufficient, allegations in plaintiffs' FAC are entitled to the inference of truth.

27

28  [2] Plaintiffs' FAC is verified by Germain, "except as to those matters stated on information and belief." FAC at 63.

12

Whereas DLA and Lerner fail to sufficiently rebut plaintiffs' FAC allegations, it appears that *defendants' affidavits* are rebutted by contravening factual evidence in *plaintiffs' affidavits*. For example, DLA claims not to "advertise in California…[or] conduct any paid nationwide advertising that could be viewed by a resident of the State of California." Lerner Decl. ¶ 5. That claim is flatly wrong, as demonstrated by several DLA advertisements in California media outlets attached to plaintiffs' opposition. Germain Decl. ¶ 6, Exs. A-F.[3] DLA and Lerner's deficient affidavit reinforces the inference of truth the Court gives to plaintiffs' FAC, where the very affidavit DLA and Lerner offer to refute jurisdiction is itself demonstrably inconsistent.

Moreover, even if DLA and Lerner did not direct Dobbs, plaintiffs properly allege that DLA and Lerner ratified Dobbs behavior. *See* FAC ¶ 108 (a computer whose IP address is registered to a DLA network made a post approving of one of the so-called "smear posts" with a "smear cheer" series of six laughing face emoticons ); *see also Myers v. Bennett Law Offices*, 238 F.3d 1068, 1073 (9th Cir. 2001) (acts of agent outside the scope of his employment may be imputed to principal for purpose of personal jurisdiction if shown to have been ratified after the fact).

Based on the inadequately disputed allegations related to the actions of their agent or employee, Dobbs, the Court finds that plaintiffs sufficiently allege that DLA and Lerner committed an intentional act within the meaning of *Calder*. The Court cautions that this is not a finding on the merits of plaintiffs' libel claim, but instead limited solely to this jurisdictional motion. Moreover, having found that Dobbs expressly aimed his act at the forum state and could foresee causing harm, those jurisdictional findings are imputed to DLA and Lerner. Similarly, having found that the libel claim arises directly and congruently out of Dobbs' contacts with the forum and no compelling case that the exercise of personal jurisdiction would be unreasonable, the Court also imputes those findings to DLA and Lerner in exercising personal jurisdiction over those defendants.

The parties also dispute whether there are facts that would give rise to personal jurisdiction over DLA and Lerner independent of Dobbs. In particular, the parties dispute the relevance of a secretly

---

[3] To blunt this criticism, DLA and Lerner submit a declaration from Ellen Ford, Vice President of Marketing/Branding and Creative Services at DLA. Her explanation that DLA "has no knowledge of where [advertisements] may be run" is unconvincing (Ford Decl. ¶ 6) because it is inconsistent with Lerner's statement that, "DLA does not conduct any paid nationwide advertising that could be viewed by a resident of the State of California." Lerner Decl. ¶ 5.

13

1 recorded presentation purportedly by David Lerner to potential investors that allegedly alludes to
2 Germain as a "cockroach," and where Lerner approves of Dobbs' internet postings. *See* Dkt. 29.
3 Plaintiffs filed an ex-parte application for an order sealing documents in order to authenticate this
4 recording and protect the identity of the person who recorded it. Dkt. 29. Having found that the Court
5 can exercise personal jurisdiction over DLA and Lerner based on plaintiffs' Dobbs-related allegations,
6 the Court declines the parties' veiled invitation to weigh the merits of libel claim by reviewing the
7 Lerner presentation. The existence and authenticity of the presentation is not relevant to resolving the
8 instant motion and plaintiffs' ex-parte application is therefore DENIED as moot.

### 2. Intentional Interference with Contractual Relations.

With regard to intentional interference with contractual relations claim, plaintiffs allege that DLA, through Lerner, ordered Doe defendant No. 7 to communicate with FINRA in a manner that disrupted the contractual relationship plaintiffs had with Germain's twin brother. FAC ¶ 153-164. Germain's twin brother, John Germain,[4] is a Senior Vice President in the Housing Finance Group at a multi-national investment bank. FAC ¶ 155. Although John is not involved in the direct or indirect day-to-day management of Piping Rock, he was appointed to the Board of Directors and is a limited partner in two investments sponsored by Piping Rock. *Id.* ¶ 156. John provided "valuable advice and counsel" to Piping Rock and his affiliation with Piping Rock provided "added credibility in the eyes of Piping Rock's business partners." *Id.* ¶ 157. Plaintiffs allege that John Doe No. 7 "made one or more communications...to one of more employees of FINRA, regarding [John Germain] and his involvement with Piping Rock." *Id.* ¶ 160. John Doe No. 7 did so "with full awareness...and with the intent to harm Plaintiffs by disrupting the contractual relationship between Plaintiffs...and [John German]." *Id.* As a result of John Doe No. 7's communication with FINRA, John Germain "severed all his ties to Piping Rock" and "no longer speaks with [twin brother plaintiff Chris German] with any regularity or at all." *Id.* ¶ 161. To connect John Doe No. 7 to DLA and Lerner, plaintiffs allege that John Doe No. 7 "conspired with the DLA defendants" or acted on behalf or DLA and Lerner as an employee or agent.

---

[4] Plaintiffs' complaint does not provide the name of Germain's twin brother. However, defendant Dobbs' motion to dismiss names "Plaintiffs' brother, John Germain." Dkt. 14 at 10.

1 FAC ¶ 25, 27. Plaintiffs argue that "[t]he only rational explanation for FINRA's pursuit of John
2 [Germain] is that the DLA defendants urged FINRA to do so as part of their retaliation against
3 Plaintiffs." Pl. Opp. at 16.

4 DLA and Lerner deny having "any contact with FINRA that relates to the allegations in the
5 Amended Complaint." Dkt. 8 at 10. Defendant Dobbs similarly denies having ever "communicated in
6 any manner, directly or indirectly, with ...[FINRA] regarding [John Germain] and his involvement with
7 Plaintiffs." Dobbs Decl. ¶ 15. As plaintiffs note, Lerner does not actually deny contacting FINRA in
8 his *first* declaration submitted to this Court. Dkt. 23 at 16. After plaintiffs' opposition to defendants'
9 motion to dismiss noted that Lerner's declaration lacked any FINRA denial, *id.*, Lerner submitted a
10 *second* declaration to this Court stating, "I never discussed John Germain, Chris Germain, or Piping
11 Rock or the website REIT Wrecks with FINRA, and I did not direct anyone at DLA to do so either."
12 Lerner Decl. II. ¶ 7.

13 Plaintiffs' intentional interference with contract allegations are admittedly imperfect. *See* Pl.
14 Opp. at 17 ("The fact that Plaintiffs' allegations are not as precise or specific as they might be should
15 not be held against Plaintiffs..."). For example, plaintiffs allege that John Doe No. 7 contacted FINRA,
16 but never actually allege that FINRA contacted John Germain, or allege anything about the content of
17 that communication. Plaintiffs allege no facts showing how FINRA's *response* to John Doe No. 7's
18 communication to FINRA caused John Germain to sever ties with Piping Rock. The Court can only
19 speculate that FINRA contacted John Germain after John Doe No. 7 contacted FINRA, causing John
20 Germain to sever his contractual relationship with Piping Rock. Similarly, defendants' denials are
21 imperfect. For example, Lerner denies having "discussed" or directing anyone to discuss John Germain
22 or Piping Rock with FINRA. Lerner Decl. ¶ 7. However, that statement does not fully deny plaintiffs'
23 allegation that John Doe No. 7 *communicated* with FINRA on DLA or Lerner's *behalf or with their*
24 *knowledge*. Lerner's denial also does not exclude the possibility that Lerner or John Doe. No. 7
25 *contacted* FINRA, which may not have included any 'discussion,' but may have included an anonymous
26 letter or other one-sided communication. Also, as noted above, a "conclusory denial" does not rebut
27 a complaint's allegation such that it defeats personal jurisdiction, *Brayton Purcell*, 606 F.3d at 1129.
28

15

1 Although the jurisdictional allegations supporting the intentional interference with contract claim are muddled, personal jurisdiction, the Supreme Court has said, is firmly rooted in the American tradition that "the courts of a State have jurisdiction over nonresidents who are physically present in the State." *Burnham v. Superior Court of Calif.*, 495 U.S. 604, 610 (1990). Accordingly, under the doctrine of pendent personal jurisdiction, the Ninth Circuit has said, "[w]hen a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts." *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004). Although "[p]ersonal jurisdiction must exist for each claim asserted against a defendant, *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1289 n. 8 (9th Cir.1977), "the facts underlying a particular claim need not exactly track the facts underlying the claims for which there is personal jurisdiction, so long as the core facts are the same." *Fiore*, 657 F.3d at 858. Additionally, "the actual exercise of personal pendent jurisdiction in a particular case is within the discretion of the district court." *Action Embroidery*, 368 F.3d at 1181.

The facts underlying plaintiffs' libel claim do not exactly track the facts underlying the intentional interference with contract claim. However, plaintiffs umbrella both claims under the same retaliation theory. Therefore, both claims arise out of the same "nucleus" of facts – namely that DLA, Lerner, Dobbs and/or other John Doe defendants committed retaliatory actions against plaintiffs that included intentional torts acts expressly aimed at plaintiffs in California, in retaliation for plaintiffs having exposed DLA and Lerner to multiple lawsuits and regulatory suspicion. While plaintiffs' libel claim is based on internet postings and the intentional interference with contract claim is based on a FINRA-related communication, plaintiffs seek to establish "malice" for both claims, likely through a showing that defendants' acts were retaliatory. *See* FAC ¶ 171, 181. Accordingly, the Court holds that it is reasonable to exercise personal jurisdiction over all defendants with respect to the intentional interference with contract claim.

///

**CONCLUSION**

For the foregoing reasons, defendants Dobbs, DLA, and Lerner's motions to dismiss for lack of personal jurisdiction are DENIED.

**IT IS SO ORDERED.**

Dated: November 9, 2012

SUSAN ILLSTON
United States District Judge