**United States District Court**
For the Northern District of California

1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5              FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7

8   PIPING ROCK PARTNERS, INC., and              No. C 12-04634 SI
    CHRISTOPHER K. GERMAIN,
                                                 **ORDER DENYING DEFENDANTS'**
9              Plaintiffs,                        **SPECIAL MOTION TO STRIKE;**
                                                 **GRANTING PLAINTIFFS' SPECIAL**
10      v.                                       **MOTION TO STRIKE**

11  DAVID LERNER ASSOCIATES, INC., DAVID
    LERNER, and GEORGE DOBBS,
12
               Defendants.
13  _____/

14

15          Plaintiffs Chris Germain and Piping Rock Partners, Inc. ("Piping Rock") have filed a second

16  amended and restated complaint ("SAC") against David Lerner Associates, Inc. ("DLA") and two

17  individuals, DLA's president David Lerner and former DLA employee George Dobbs, for libel.[1]

18  Defendants DLA and Lerner filed a counterclaim against plaintiffs alleging tortious interference with

19  contract, tortious interference with prospective business advantage, and commercial disparagement.

20  Defendants have moved to strike plaintiffs' libel claim pursuant to California Civil Code § 425.16

21  ("anti-SLAPP law").[2]   Plaintiffs have similarly moved to strike defendants DLA and Lerner's

22  _____

23          [1] Plaintiffs' SAC also alleges intentional interference with contractual relations and intentional
    interference with prospective economic advantage.  However, plaintiffs concede that they have failed
24  to state a claim for either of these causes of action. *See* Dkt. 65 at 28-29.  Plaintiffs' allegations that
    defendants contacted a regulatory agency are barred as a matter of law because they are covered by
25  California's litigation privilege.  *See Fontani v. Wells Fargo Investments, LLC,* 129 Cal. App. 4th 719,
    734 (2005).  Accordingly, pursuant to Federal Rule of Civil Procedure 12(c), the Court DISMISSES
26  these causes of action WITH PREJUDICE.

27          [2] Defendants DLA and Lerner and defendant Dobbs filed separate motions to strike. *See* Dkts.
    59, 61.  Although defendants make identical arguments in their separate motions, DLA and Lerner
28  initially took the position that there was no evidence attributing the alleged libelous statements to either
    DLA or Lerner, as opposed to DLA's former employee, Dobbs.  However, the parties later stipulated,
    only for the purposes of the instant motions, that "if liability were to be found against George Dobbs,
    such liability would thereby attach to the DLA Defendants."  Dkt. 73 at 2.  Accordingly, the Court
    herein treats the defendants' separate motions as one motion for the purposes of this Order.

United States District Court
For the Northern District of California

1  counterclaim pursuant to the anti-SLAPP law.  The parties' motions have been fully briefed and on

2  April 19, 2013, the Court held a hearing on the motions.  For the reasons set forth below, the Court

3  DENIES defendants' special motion to strike and GRANTS plaintiffs' special motion to strike.

4

5                                        **BACKGROUND**

6         Plaintiff Chris Germain is the sole shareholder of plaintiff Piping Rock Partners, Inc., a

7  California corporation that specializes in the acquisition and management of real estate for investment

8  purposes.  Germain is also the founder of REIT Wrecks, a blog where he and others discuss real estate

9  investment trusts ("REITs").  Defendant David Lerner is the president and controlling owner of

10 defendant David Lerner Associates, Inc., a privately-held brokerage firm incorporated in New York that

11 sells security interests in REITs and other investment products.  Defendant George Dobbs, a citizen of

12 New Jersey, was employed at DLA as a registered securities broker from August 2003 to June 2012.

13        In January 2010, Germain launched a public forum on his blog REIT Wrecks to encourage

14 discussion of non-traded REITs.  In response to a reader's post about DLA and Lerner, Germain posted

15 a reply explaining that DLA and Lerner appeared to be violating a regulation promulgated by the

16 Financial Industry Regulatory Authority (FINRA).  After months of publicity – including an article in

17 Bloomberg discussing non-traded REITs and identifying Germain and REIT Wrecks by name, and a

18 blog posting exchange between the Chief Compliance Officer for DLA and Germain – on May 27, 2011,

19 FINRA filed a formal complaint against DLA, alleging various improprieties in connection with the

20 non-traded REITs that DLA managed.  In addition, two class action lawsuits were filed against DLA.

21        Plaintiffs allege that from June 23 to June 29, 2011, defendants conducted a retaliatory online

22 "smear campaign" against Germain, Piping Rock, and the two law offices that filed the class action suits

23 against DLA.  The smear campaign included nineteen allegedly libelous posts on various consumer-

24 report websites, including eight identical posts directed at Germain and Piping Rock.  Defendant Dobbs

25 admits authoring the eight posts at issue.  However, the balance of eleven posts remain attributed to Doe

26 defendants.  The text of the eight identical posts was originally posted on the website "Ripoff Reports."

27 The text of that post was re-posted on other websites, including scaminfomer.com, getpayback.com,

28 pissconsumer.com, complaintsboard.com, scamfound.com, and boardreader.com.  In the posts, the

United States District Court
For the Northern District of California

author – defendant Dobbs allegedly acting on behalf of or at the direction of DLA and Lerner – accuses Piping Rock and Germain of having engaged in dishonest, fraudulent, and potentially criminal business practices. SAC ¶ 134-35, Ex. EE. Plaintiffs contend that Dobbs's statements are demonstrably false.

Defendants counter that beginning in January 2010, Germain commenced his own unlawful campaign to interfere with DLA's business through postings on his REIT Wrecks blog. In particular, they allege that Germain accused DLA of fraudulent criminal activity, lying to its investors, and scamming customers. Defendants point to twelve statements posted on REIT Wrecks that were allegedly authored by Germain or "encouraged and sanctioned" by him. Counterclaim ¶ 20. DLA and Lerner contend that these statement have no basis in fact. Moreover, DLA and Lerner also allege that Germain intended to interfere with DLA's client relationships and that some clients redeemed their investments after encountering negative information about them on the internet.

On April 9, 2012, plaintiffs filed a complaint against John Doe Nos. 1-6 in San Francisco County Superior Court, alleging libel and intentional interference with contractual relations under California law. On June 25, 2012, plaintiffs filed a first amended complaint, and later on July 17 and July 23, 2012, plaintiffs filed amendments to the first amended complaint naming Dobbs, Lerner, DLA, and John Doe Nos. 1-7 as defendants. On September 5, 2012, DLA and Lerner removed the action to federal court. On November 9, 2012, the Court denied defendants' motion to dismiss for lack of personal jurisdiction. On December 21, 2012, plaintiffs filed their second amended and restated complaint.[3] The parties' cross motions to strike under California's anti-SLAPP statute followed thereafter.

## LEGAL STANDARD

The California anti-SLAPP statute permits defendants to bring a "special motion to strike" if a cause of action against them arises "from any act . . . in furtherance of the . . . right of petition or free speech . . . in connection with a public issue," unless "the plaintiff has established that there is a

---

[3] In their answer to the SAC, defendants DLA and Lerner note that plaintiffs filed the SAC pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), yet had previously amended their complaint in state court prior to removal. Thus, defendants urge that plaintiffs should have moved for leave to file the SAC here. However, defendants have not made a motion to strike the SAC or otherwise properly placed this issue before the Court. Because defendants have not timely objected to the filing of the SAC and do not otherwise dispute that the SAC is the operative complaint, defendants have waived any such objection.

probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16(b)(1). "In making

its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating

the facts upon which the liability or defense is based." *Id*. at § 425.16(b)(2). If a defendant prevails on

a motion to strike, that defendant "shall be entitled to recover his or her attorney's fees and costs." *Id*.

§ 425.16(c). Although it is a state statute, California's anti-SLAPP protections apply to state law claims

brought in federal court. *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d

963, 971-73 (9th Cir. 1999).[4]

     In evaluating an anti-SLAPP motion, courts engage in a two-part inquiry. "First, a defendant

must make an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the

defendant's rights of petition or free speech . . . Second, once the defendant has made a prima facie

showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged

claims." *Vess v. Ciba-Geigy Corp*., 317 F.3d 1097, 1110 (9th Cir. 2003). The plaintiff's burden is

"comparable to that used on a motion for judgment as a matter of law." *Price v. Stossel*, 620 F.3d 992,

1000 (9th Cir. 2010). "The plaintiff must demonstrate that the complaint is legally sufficient and

supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted

by the plaintiff is credited. A defendant's anti-SLAPP motion should be granted when a plaintiff

presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists

to support a judgment for the plaintiff." *Id*. at 1000 (citations and internal quotation marks omitted).

Evidence must be admissible and is not weighed by the Court, but presumed true if in favor of the

plaintiff. *See, e.g.*, *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001); *Tichinin v. City

of Morgan Hill*, 177 Cal. App. 4th 1049, 1062 (2009).

---

    [4] The *Newsham* case articulates the current Ninth Circuit law and will be applied here. However,
some judges, including notably the Chief Judge of the Ninth Circuit, have questioned its correctness.
*See, e.g., Makaeff, etc., et al., v. Trump University, etc., et al.*, 13 CDOS 3774 (April 17, 2013)(two
separate concurring opinions, each suggesting that the anti-SLAPP statutes are procedural, not
substantive, and therefore should not be applied in federal courts).

United States District Court
For the Northern District of California

**DISCUSSION**

**I.    Defendants' Motion to Strike Plaintiffs' Libel Claim.**

 **A. Act in furtherance of the defendant's rights of free speech**

  The first step in analyzing an anti-SLAPP motion is determining whether the defendant successfully made "an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech." *Vess*, 317 F.3d at 1110. California's anti-SLAPP statute defines such as an act to include, *inter alia*, "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Cal. Code Civ. Proc. §§ 425.16(e).

  Plaintiffs concede that the Ripoff Reports website is a public forum, but dispute whether Dobbs's posting was in connection with an issue of public interest. Dobbs's posting read as follows:

> If you are looking to invest in real estate or need to do a 1031 exchange stay far away from Piping Rock Partners and especially Christopher Germain the president of the company. They will promise you the rosiest of scenarios with the lowest cost but unfortunately after the documents are signed and the check is cashed you find out it was anything but true. These guys leverage real estate using over 90% debt, through first and second mortgages. They show you how good the revenue stream is and the dividends you'll earn so that the debt seems inconsequential. Well I'm here to tell you it's nothing like Chris Germain says it is.

> The property I bought a share of was a complete bust, but his presentation was that this was the "deal of a life time." All the generous revenue I was going to make never materialized. When I questioned him he gave me every song in the book until he wouldn't even take my calls. I can't begin to tell you how many thousands of dollars I had to come up with so I don't lose my investment. The other partners in this property are also disillusioned and angry.

> I did a 1031 exchange. I had done very well on my own in real estate and this is my retirement nest egg. My wife and I are losing sleep wondering if we'll have anything left. I can't even sell my share although Chris made it sound like it wouldn't be a problem with his contacts and sources if I wanted to sell down the road. He babbled something about the bad market whenever I brought it up.

> They say a fish stinks from the head well this must be true for Piping Rock Partners. They tout their decades of experience which is laughable. They have a few guys and they added up each person's years in real estate investments. Heck if there was an office of 50 one-year rookies they could say they had 50 years of real estate experience! If this report spares one person from the financial problems and the anxiety about losing your retirement nest egg to a shyster then it is worth it. Chris has a Wall St. background, maybe Bernie Madoff was his mentor. I'm sure Bernie would be proud of him.

United States District Court
For the Northern District of California

*See* FAC ¶ 135, Ex. EE.  Although California's anti-SLAPP law provides no definition of "an issue of public interest," courts have established guiding principles for what distinguishes a public interest from a private one:

> (1) "public interest" does not equate with mere curiosity;
> (2) a matter of public interest should be something of concern to a substantial number of people; a matter of concern to a speaker and a relatively small specific audience is not a matter of public interest;
> (3) there should be some degree of closeness between the challenged statements and the asserted public interest – the assertion of a broad and amorphous public interest is not sufficient;
> (4) the focus of the speaker's conduct should be the public interest rather than a mere effort to gather ammunition for another round of private controversy; and
> (5) a person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people.

*See Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1132-1133 (2003) (citing cases).

Defendants argue that Dobbs's posts relate to an issue of public interest because they "concern Plaintiffs' character and business practices" and were "intended to serve as warning to consumers about Plaintiffs and their trustworthiness in business."  Def. Dobbs Mot. to Strike (Dkt. 59) at 20-21.

Plaintiffs argue that the post cannot be a legitimate consumer warning because it is demonstrably false.  In particular, they note that Dobbs never invested with plaintiffs, plaintiffs have never engaged in any 1031 exchanges,[5] and that Dobbs never had any relevant business dealings with plaintiffs from which to form any opinion as to plaintiffs.  Thus, plaintiffs conclude that Dobbs could not have been seriously intending to aid consumers.

The Court disagrees.  California law does not require a statement to be serious or truthful in order to concern an issue of public interest.  In fact, courts have explicitly rejected this view.  By asserting that the statements are not in the public interest because they are false, plaintiffs urge the Court to "read a separate proof-of-validity requirement into the operative sections of the statute," which this Court cannot do.  *Navellier v. Sletten*, 29 Cal.4th 82, 94 (2002) (citations omitted).  Moreover, "[p]laintiffs' argument confuses the threshold question of whether the SLAPP statute potentially applies with the question of whether an opposing plaintiff has established a probability of success on the merits."  *Id.*

---

[5] "1031 Exchange" likely refers to a real estate exchange transaction available under 26 U.S.C. § 1031, which provides that for certain types of property transactions, recognition of capital gains upon sale may be deferred, as may any capital gains taxes otherwise due.  *See* 26. U.S.C. § 1031.

6

1    The cases cited by plaintiffs compel no different result.  In *Wilbanks v. Wolk*, 121 Cal. App.4th

2   883, 900 (2004), the court held that statements "ostensibly provided to aid consumers choosing among

3   brokers . . . were directly connected to an issue of public concern."  There the question did not turn, as

4   plaintiffs suggest, on the credibility of the speaker as a known consumer watchdog.  Instead, the court

5   focused on the substance of the statements which "were a warning not to use plaintiffs' services." *Id.*

6   at 900.  Similarly, in *Chaker v. Mateo*, the court held that "statements posted to the 'Ripoff Report' Web

7   site about [plaintiff's] character and business practices plainly fall within the rubric of consumer

8   information about [plaintiff's] business and were intended to serve as a warning to consumers about his

9   trustworthiness."  209 Cal. App. 4th 1138, 1146 (2012).  In that case, defendant Wendy Mateo posted

10   derogatory statements about Chaker, the operator of a forensics business.  *Id.* at 1142.  Chaker was

11   simultaneously involved in a child custody and paternity dispute with Mateo's daughter.  *Id.*  However,

12   contrary to plaintiffs' assertion, nowhere did the court conclude that "Mateo's first-hand experience with

13   Chaker" was dispositive.  *See* Pls. Opp. to Dobbs Mot. (Dkt. 64) at 12.  In fact, there is nothing in

14   *Chaker* to indicate that Mateo had any actual business relationship with the plaintiff.  Instead, the court

15   focused on the substance of the consumer-related allegations, not their veracity or credibility of

16   credibility of the author.  *Id*. at 1149-50.

17    Here, as in *Chaker* and *Wilbanks*, Dobbs's statement is a warning to consumers not to do

18   business with plaintiffs because of their allegedly faulty business practices.  It makes no difference, for

19   purposes of the public interest requirement, that the warning was not sincere, accurate, or truthful.

20   Accordingly, the Court finds that defendants have made a threshold showing that plaintiffs' suit arises

21   from an act in furtherance of the defendants' rights of petition or free speech.[6]

23    **B.    Libel**

24    Once defendants have met their burden of showing that the plaintiff's suit arises from an act in

25   furtherance of the defendant's rights of petition or free speech, the burden "shifts to the plaintiff to

---

27         [6] Having found the consumer warning rationale a sufficient public interest, the Court need not
28   address plaintiffs' additional arguments that the Dobbs's posts did not concern a matter in the public
interest because too few consumers were interested in the matter, or there was no ongoing controversy
over 1031 exchanges.

demonstrate a probability of prevailing on the challenged claims." *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1110 (9th Cir. 2003). Plaintiffs' sole claim is that the Dobbs's post is libelous on its face. Under California law, libel is "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Code Civ. Proc. § 45. California law further defines libel *per se*, also called libel on its face, as "[a] libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact." Cal. Code Civ. Proc. § 45a.

"The initial determination as to whether a publication is libelous on its face, or libelous *per se*, is one of law." *Selleck v. Globe Int'l, Inc.*, 166 Cal. App. 3d 1123, 1132 (1985). "It is error for a court to rule that a publication cannot be defamatory on its face when by any reasonable interpretation the language is susceptible of a defamatory meaning." *Selleck*, 166 Cal. App. 3d at 1131. A defamatory meaning must be found, if at all, in a reading of the publication as a whole. *See Kaelin v. Globe Comms. Corp.*, 162 F.3d 1036, 1040 (9th Cir.1998).

"California courts in libel cases have emphasized that the publication is to be measured, not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." *Kaelin*, 162 F.3d at 1040 (citations and alterations omitted). "So long as the publication is reasonably susceptible of a defamatory meaning, a factual question for the jury exists." *Id.* (citations and alterations omitted).

The parties' principal dispute is over whether the relevant audience understood Dobbs's post to be a statement of fact or of his opinion. Generally, statements of opinion are not actionable as defamation, whereas statements of fact are actionable. *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 695-96 (2012). Whether a statement is a fact or opinion is a question of law for the court to decide. *Baker v. Los Angeles Herald Examiner*, 42 Cal. 3d 254, 260 (1986); *see also*, *Chaker*, 209 Cal. App. 4th at 1147. Applying a totality of the circumstances test in order to distinguish actionable fact from opinion requires that the court the court: "(1) examine the statement in its totality in the context in which it was uttered or published; (2) consider all the words used, not merely a particular phrase or sentence; (3) give weight to cautionary terms used by the person publishing the statement; and (4) consider all of

the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980).

Defendants characterize Dobbs's posts as merely a vague description of a bad business deal which uses hyperbolic language to convey defendants' subjective view that plaintiffs are dishonest. Defendants also assert that the very context of the posting – an anonymous website for disgruntled consumers – creates a presumption that the posting is unreliable and therefore non-actionable opinion. The Court disagrees on both fronts.

In First Amendment jurisprudence, the rule is well established that the expression of an opinion does not constitute an actionable cause of action for defamation. *Information Control v. Genesis One Computer Corp.*, 611 F.2d 781, 783 (9th Cir.1980); *Gregory v. McDonnell Douglas Corp.*, 17 Cal. 3d 596, 600 (1976). The United States Supreme Court has ruled that "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth." *Linn v. Plant Guard Workers*, 383 U.S. 53, 63 (1965); *Letter Carriers v. Austin*, 418 U.S. 264, 283–284 (1973). However, a plaintiff may state a defamation claim that survives First Amendment challenge by presenting "evidence of a statement of fact that is provably false." *Seelig v. Infinity Broadcasting Corp.*, 97 Cal. App. 4th 789, 809 (2002). "The critical question is not whether a statement is fact or opinion, but whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1370 (2010) (internal quotation marks omitted).

Dobbs's post is not entirely opinion, as defendants suggest. It contains a blend of subjective opinions and provably false assertions of fact. Sprinkled throughout Dobbs's post are apparent opinions, such as:

> If you are looking to invest in real estate or need to do a 1031 exchange stay far away from Piping Rock Partners and especially Christopher Germain the president of the company . . . They say a fish stinks from the head well this must be true for Piping Rock Partners. They tout their decades of experience which is laughable. . . If this report spares one person from the financial problems and the anxiety about losing your retirement nest egg to a shyster then it is worth it. Chris has a Wall St. background, maybe Bernie Madoff was his mentor. I'm sure Bernie would be proud of him.

United States District Court
For the Northern District of California

1    While these are the sorts of exaggerations and hyperbole courts routinely consider opinion, here the

2    entire basis of the opinion is that Dobbs entered into a transaction with plaintiffs, and that the outcome

3    was unsatisfactory.  Dobbs writes, "[t]he property I bought a share of was a complete bust, but his

4    presentation was that this was the 'deal of a life time'" and that "I did a 1031 exchange."  Here Dobbs

5    is asserting that he purchased a property or engaged in a 1031 exchange transaction in connection with

6    some presentation by plaintiffs.  Further, he writes that he actually had contact with plaintiff Germain

7    about the supposed transaction, "[w]hen I questioned him, he gave me every song in the book until he

8    wouldn't take my calls" and "I can't even sell my share although Chris [Germain] made it sound like

9    it wouldn't be a problem with his contacts and sources if I wanted to sell down the road.  He babbled

10   something bad about the market whenever I brought it up."  These statements represent that Dobbs

11   actually communicated with Germain and that in those communications Germain failed to follow

12   through on what had been promised to Dobbs.

13       Each of these factual assertions – the purchase, investment, unsatisfactory performance, and

14   communications thereabout – are not only provably false, their falsity is unrebutted.  In essence, Dobbs

15   completely fabricated his claims to have lost money on a 1031 exchange transaction or some property-

16   related transaction he conducted with plaintiffs.  The evidence shows that Dobbs never invested with

17   plaintiffs, and plaintiffs have never engaged in a 1031 exchange with *anyone*.  *See* SAC ¶138; Germain

18   Decl. I ¶ 5 (Dkt. 65-1).  In fact, Dobbs has never had any business dealings or communications with

19   plaintiffs, and does not assert that he has had any relevant contact with anyone who has.  *See id.*  Dobbs

20   states that his purpose in making the post was to retaliate against Germain for his blog posts about DLA

21   and Lerner on REIT Wrecks.  *See* Dobbs Decl. ¶13 (Dkt. 59-1) ("Regrettably, when the stress and

22   pressure from the personal and professional issues discussed above became extreme, I made the

23   following posting about Plaintiffs on the RipoffReport website and similar websites.").

24       Taken as a whole, Dobbs's statements cross the line from opinion to fact.  Although statements

25   of opinion are not *per se* actionable, an opinion loses its constitutional protection and becomes

26   actionable when it is "based on implied, undisclosed facts" and "the speaker has no factual basis for the

27   opinion."  *Ruiz v. Harbor View Community Association*, 134 Cal. App. 4th 1456, 1471 (2005).  That is,

28   expressions of opinion do not enjoy blanket constitutional protection.  *See Franklin v. Dynamic Details,*

10

*Inc.*, 116 Cal. App. 4th 375, 384 (2004).  "If a statement of opinion implies a knowledge of facts which may lead to a defamatory conclusion, the implied facts must themselves be true."  *Ringler Associates Inc. v. Maryland Casualty Co.*, 80 Cal. App. 4th 1165, 1181 (2000).

Here, to the extent that part of the statement merely reflect Dobbs's opinions, those opinions appear to be tied demonstrably false facts.  Dobbs contends that his language his the posts is "loose . . . figurative . . . exaggeration, opinion, hyperbole, and creative descriptions of contempt."  Dobbs Decl. ¶ 14.  The Court disagrees.  On the whole, the post is a statement of fact about a deal gone wrong, and the opinions expressed therein are based on those facts.  At the very least, the post "is reasonably susceptible of a defamatory meaning."  *Kaelin*, 162 F.3d at 1040.  Therefore, the Court declines to strike plaintiffs' libel claim.

The cases cited by defendants compel no different result.  Defendants argue that internet message boards such as Ripoff Report are inherently hyperbolic and postings therein are presumptively non-actionable opinion.  In support, defendants rely on *Chaker v. Mateo*, 209 Cal. App. 4th 1138 (2012) and *Summit Bank v. Rogers*, 206 Cal. App. 4th 669 (2012).  As discussed above, *Chaker* involved a defendant whose daughter was engaged in custody and paternity litigation with plaintiff – the owner of a forensics business.  209 Cal. App.4th at 1141-42.  Defendant posted a series of defamatory insults on Ripoff Report and on the social networking site "Topix."  *Id.* at 1146-47.  Although the court noted that websites like Ripoff Report "plainly invited the sort of exaggerated and insulting criticisms of business and individuals which occurred here," the court acknowledged that verifiable statements – such as Mateo's allegation that Chaker was a "criminal" – might constitute defamation if not demonstrably true.  *Id.* at 1149-50.  Dobbs's post, however, is entirely premised on a series of verifiably false statements of (alleged) fact.  To the extent Dobbs expresses opinions about plaintiffs, that opinion appears to arise out of his verifiably fabricated factual scenario.

Similarly, in *Summit Bank*, the court noted that postings on the Craigslist "Rant and Raves" website often lack "the formality and polish typically found in documents in which a reader would expect to find facts."  206 Cal. App. 4th at 699 (citations omitted).  There the defendant posted a series of insults denigrating the plaintiff bank and its CEO.  Like Dobbs, his insults seemed to arise out of his interaction with the bank as a customer, though he had never actually been a customer.  *Id.* at 698.  The

1    Court noted that other than his customer status, however, defendant's factual assertions were non-

2    actionable because they "were basically true." *Id.* Beyond that, the court found determinative the view

3    of the average reader of the website, who would know from the "tone and substance" that these were

4    exaggerations, "not the Bank or a banking expert who might view them as conveying some special

5    meaning." *Id.* at 699. Unlike the defendant in *Summit Bank*, however, each and every one of Dobbs's

6    factual assertions that support his opinions is verifiably false. Although the parties dispute whether the

7    average reader in this case is someone who reads Ripoff Reports or someone who searched for plaintiffs

8    on "Google," this is of no moment. This is simply not a case where Dobbs's various opinion-like

9    statements are based even on partially true factual assertions, as in *Summit Bank*. And there is no

10   evidence here that readers of either Google or Ripoff Reports would expect purported facts to be

11   anything other than true.

12        Accordingly, the Court concludes that the post is an actionable statement of fact, rather than

13   opinion. Plaintiffs have presented evidence that the statement at issue, both in its content and when

14   viewed in its context, is reasonably capable of a defamatory meaning or is substantially false. Thus,

15   plaintiff has established a probability of prevailing on its claim and the motion to strike shall be granted.

16

17        **C.      Unclean Hands Defense.**

18        Defendants argue that even if Dobbs's post is actionable, plaintiffs are nonetheless barred from

19   bringing their claim because of Germain's unclean hands in engaging in "the exact same conduct" as

20   that which forms the basis of his libel claim. DLA Mot. to Strike (Dkt. 61) at 11. Defendants allege

21   that Germain made postings on Ripoff Report about DLA and two DLA employees, Stephanie and

22   Marty Walcoe – David Lerner's daughter and son-in-law – nearly identical to Dobbs's posting on the

23   same website. DLA Mot., Exs. B, C (Dkts. 61-2, 61-3). Defendants also allege that Germain emailed

24   Marty Walcoe after making the post in order to mock Walcoe over the very post Germain had just made.

25   *Id.* Ex. D (Dkt. 61-4). Plaintiffs concede that Germain made the posting, in which he copied Dobbs's

26   original posting and changed the relevant nouns to direct the post at DLA and at the Walcoe's. Germain

27   Decl. ¶ 21. However, plaintiffs contend that Germain's posts were in reaction to Dobbs's post, which

28   he believed came from DLA, but did not know that it had come from Dobbs in particular. *Id.* ¶¶ 21-22.

United States District Court
For the Northern District of California

Germain "was fervently hoping that posting the Walcoe Posts might cause DLA to halt the Smear Campaign" against him. *Id.* ¶ 21.

The unclean hands doctrine is "a vehicle for affirmatively enforcing the requirements of conscience and good faith" which "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). "Under California law regarding the applicability of the unclean hands defense, '[t]he focus is the equities of the relationship between the parties, and specifically whether the unclean hands affected the transaction at issue.'" *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 667 (9th Cir. 2012) (quoting *Jaramillo v. County of Orange*, 200 Cal. App. 4th 811, 820 (2011). "The doctrine of unclean hands requires unconscionable, bad faith, or inequitable conduct by the plaintiff in connection with the matter in controversy." *Fladeboe v. American Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 56 (2007).

As a threshold matter, plaintiffs contend that an unclean hands defense cannot be asserted at such an early stage of the pleadings, particularly where the facts that would establish such a defense are in dispute. The Court agrees. Whether the doctrine of unclean hands applies is a question of fact. *See CrossTalk Productions, Inc. v. Jacobson*, 65 Cal. App. 4th 631, 639 (1998). For the doctrine to apply in the context of an anti-SLAPP motion, the defendant must show that "a plaintiff's own pleadings contain admissions that establish the basis of an unclean hands defense," without the need for a further evidentiary hearing. *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal. App. 4th 658, 681 (2005).

According to defendants, it is undisputed that Germain knew his posting would be irreversible; copied the statements about him and Piping Rock that Dobbs posted and added some remarks about Stephanie Walcoe spending time at a nail salon; changed the names and subjects; posted the statement on Ripoff Reports; and followed up with an email to Marty Walcoe. Defendants overstate the evidence. At best, the evidence simply shows that Germain made the posting and sent the email at a few days after Dobbs posted his allegedly libelous statement on the same website. The "nature of the conduct" and "the relationship of the misconduct to the claimed injuries," however, are far from clear from this evidence. *See Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 979 (2000).

1   Because the evidence does not conclusively establish these elements of the unclean hands the defense,

2   the Court finds that it would be premature to defendants to invoke it now.  Accordingly, the Court

3   declines to strike plaintiff's libel claim on this basis and DENIES defendant's motion.

4

5   **II.   Plaintiffs' Motion to Strike Defendants' Counterclaim.**

6         **A.   Act in furtherance of the defendant's rights of free speech**

7         The Piping Rock plaintiffs/counterdefendants have also moved to strike the DLA/Lerner

8   counterclaims for tortious interference with contracts, tortious interference with prospective business

9   advantage, and commercial disparagement.  The Court begins its analysis of this motion under the anti-

10  SLAPP law by determining whether counterdefendant/Piping Rock successfully made a prima facie

11  showing that the "suit arises from an act in furtherance of [Piping Rock's] rights of petition or free

12  speech." *Vess*, 317 F.3d at 1110.  The parties' dispute here centers around the anti-SLAPP statute's use

13  of the term "public," in its definition of such an act to include "any written or oral statement or writing

14  made in a place open to the public or a public forum in connection with an issue of public interest." Cal.

15  Code Civ. Proc. §§ 425.16(e).

16        DLA and Lerner's counterclaim arises from twelve statements Germain posted on his blog, REIT

17  Wrecks.  Counterdefendants Germain and Piping Rock argue that the twelve statements qualify for anti-

18  SLAPP coverage because they were made on public internet website, accessible by all.  DLA and Lerner

19  argue that REIT Wrecks is not public because Germain controls the very website on which he posted

20  the offending statements.

21        "Cases construing the term 'public forum' as used in section 425.16 have noted that the term is

22  traditionally defined as a place that is open to the public where information is freely exchanged."

23  *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1006 (2001) (citations omitted).  This

24  encompasses websites and online message boards and forums "that are accessible free of charge to any

25  member of the public where members of the public may read the views and information posted, and post

26  their own opinions."  *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1576 (2005); *see also Global*

27  *Telemedia Intern., Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1265 (C.D. Cal. 2001).  However, "[m]eans of

28  communication where access is selective . . . are not public forums." *Weinberg v. Feisel*, 110 Cal. App.

United States District Court
For the Northern District of California

1    4th at 1130 (2003) (citing *Arkansas Educ. TV v. Forbes*, 523 U.S. 666, 678-680 (1998)).

2        The parties do not dispute that the REIT Wrecks website is open to the public and free of charge;

3    and that anyone may contribute to the online forum after registering.  However, DLA and Lerner

4    contend that REIT Wrecks cannot be a public forum because Germain has the ability to restrict, edit,

5    delete, or prohibit posts.  This argument is unavailing.  Courts have repeatedly held that websites like

6    REIT Wrecks are public forums.  *See Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006) ("Web sites

7    accessible to the public, like . . . 'newsgroups' . . . are 'public forums' for purposes of the anti-SLAPP

8    statute.").  *See also Summit Bank,* 206 Cal. App. 4th at 693 ("Without doubt, Internet message boards

9    are places 'open to the public or a public forum' for purposes of section 425.16."); *Wong v. Tai Jing*,

10   189 Cal. App. 4th 1354, 1366 (2010) ("It is settled that 'Web sites accessible to the public ... are public

11   forums for purposes of the anti-SLAPP statute.'"); *ComputerXpress*, 93 Cal. App. 4th at 1007.

12       The fact that Germain has the *ability* to control the forum does not automatically diminish its

13   public-ness for anti-SLAPP purposes.  As the Piping Rock counterdefendants argue, *every* website

14   owner has that ability, and on that view, no website could ever be a public forum.  The DLA

15   counterplaintiffs point to case law suggesting that a newsletter or newspaper is not a public forum if its

16   editors restrict or control content.  *See Weinberg v. Feisel*, 110 Cal. App. 4th at 1130–1131.  However,

17   the evidence submitted by Piping Rock shows that Germain has not exercised any control over the

18   forum, except in very narrow instances: to remove obvious spam, to correct technical errors, and two

19   instances that involved the posting of potentially discriminatory speech and private identifying

20   information.  Germain Decl. III, ¶¶ 4-6 (Dkt. 60-1).  Moreover, the Piping Rock counterdefendants point

21   to the case of *Wilbanks v. Wolk*, where the court held that a website was a public forum even where the

22   defendant owned the website at issue, controlled it, and did "not post information or opinions from other

23   sources."  121 Cal. App. 4th at 895-98.  The court analogized defendant's website to a posting on a

24   public bulletin board, noting that the website was just one posting on the broader public forum, the

25   entire internet: "A public bulletin board does not lose its character as a public forum simply because

26   each statement posted there expresses only the views of the person writing that statement.  It is public

27   because it posts statements that can be read by anyone who is interested, and because others who choose

28   to do so, can post a message through the same medium that interested persons can read."  *Id.* at 897.

1    Thus, if a website whose owner exercises complete control can still be a public forum, there is little

2    doubt that REIT Wrecks, which allows nearly unfiltered public viewing and posting, is also a public

3    forum.

4         The DLA counterplaintiffs' reliance on *Global Telemedia*, 132 F. Supp. 2d at 1264, is also

5    unavailing.  There the court found internet chat rooms to be public forums in part because there were

6    "no controls on the postings.  Literally anyone who has access to the Internet has access to the chat-

7    rooms."  *Id.*  First, the same is basically true of REIT Wrecks; nearly everyone with access to the

8    internet can register, view, and post on the forum.  Second, California's anti-SLAPP law specifically

9    provides that its provisions "shall be construed broadly," Cal. Code Civ. Proc. § 425.16(a), and courts

10   interpreting the public forum requirements have done so in situations where the websites were more

11   restricted than REIT Wrecks.  *See Wilbanks v. Wolk*, 121 Cal. App. 4th at 896 ("Given the mandate that

12   we broadly construe the anti-SLAPP statute, a single publication does not lose its 'public forum'

13   character merely because it does not provide a balanced point of view.").

14        Accordingly, the Court declines to adopt the DLA counterplaintiffs' position that a website can

15   only be a public forum where it is a complete free-for-all.  The parties do not dispute that the twelve

16   postings concerned an issue of public interest.  Thus, having found that the REIT Wrecks website is a

17   public forum, the Court finds that the Piping Rock counterdefendants have made the threshold showing

18   that the DLA counterplaintiffs' suit arises from acts in furtherance of Piping Rock's rights of petition

19   or free speech.

20

21        **B.       Probability of Prevailing on the Counterclaims**

22             **1.       Choice of Law**

23        The DLA counterplaintiffs argue that New York law, not California law, should govern the

24   analysis of what they must demonstrate with respect to the probability of prevailing in this diversity

25   action.  When a litigant invokes a foreign state's law, federal courts sitting in diversity apply the same

26   choice of law rules that the forum state would.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487

27   (1941).  "California courts employ a 'governmental interest analysis' to assess whether California law

28   or non-forum law should apply."  *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009).  Under this

analysis, courts first "examine the substantive law of each jurisdiction to determine whether the laws differ as applied" – that is, whether it would lead to a different result; second "determine whether a true conflict exists in that each of the relevant jurisdictions has an interest in having its law applied"; and third, "must determine which forum's law would be most impaired if its laws were not applied." *Anschutz Corp. v. Merrill Lynch and Co. Inc.*, 785 F. Supp. 2d 799, 821-22 (N.D. Cal. 2011) (internal quotations omitted), citing *Coufal Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000). Courts need not engage further in a choice of law analysis where there is no material conflict between the laws of the states involved. *See Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1465 (2007).

The DLA counterplaintiffs argue that New York law and California law differ in how they treat defamation-like allegations that are not actually labeled defamation. In their motion to strike, the Piping Rock counterdefendants argue that while DLA does not label them as such, the essence of the allegations for each counterclaim is that the Piping Rock counterdefendants performed a defamatory speech act. Citing *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1042 (1986), Piping Rock argues that the Court need not address the claims as they are currently labeled because the "gravamen is the alleged injurious falsehood of a statement," citing *Blatty*, 42 Cal.3d at 1042. In *Blatty*, the California Supreme Court rejected attempts to avoid the rigorous First Amendment protections available for defamation claims by simply mislabeling the claims, while still making the same underlying defamatory allegations. *Id*. at 1048 ("It follows that to prevent creative pleading from rendering the limitations nugatory, they must be broadly applicable whenever the gravamen of the claim is injurious falsehood.").

The DLA counterplaintiffs contend that New York law differs because it does not follow this "gravamen" approach which treats injurious falsehood claims as defamation even where they are labeled as something else. According to DLA, New York law looks to the "essence of the action," not the "gravamen," to determine whether a claim otherwise labeled should nonetheless be treated as defamation. *See Morrison v. National Broadcasting Co.*, 19 N.Y.2d 453, 459 (1967). The *Morrison* Court emphasized that the essence of the injury in a defamation claim is reputational. *Id*. 458-59. DLA argues that the allegations in its counterclaims are not about reputational injury, but rather about economic injury. Thus, they argue that under New York law, their allegations would not be treated as

1  defamation, whereas under California's "gravamen" approach, they could be construed as defamation

2  claims.

3       The Court disagrees with DLA's contention that there is a conflict in these jurisdictions' laws.

4  *Morrison* itself reveals that "gravamen" versus "essence of the action" is a distinction without a

5  difference.  In *Morrison*, the New York Court of Appeals was striving to assure – just as the California

6  Supreme Court had done in *Blatty* – that courts "look for the reality, and the essence of the action and

7  not its mere name."  *Id.* at 459.  Moreover, California courts have said precisely the same thing about

8  defamation, that it "injures a person's reputation.  Rather than interfering with a property right,

9  economic relations, or the sale of goods, defamation invades the interest in personal or professional

10 reputation and good name."  *Truck Ins. Exch. v. Bennett*, 53 Cal. App. 4th 75, 85 (1997).  There simply

11 is no conflict here.  Later New York cases even explicitly use the term "gravamen" when deciding to

12 treat an otherwise-labeled tortious cause of action as "defamation," where "[t]he gravamen of the . . .

13 Complaint is [that] . . . Plaintiff claims to have been 'falsely blamed' . . . [and] as a result of being

14 'falsely blamed,' his 'reputation within his trade has been tarnished.'"  *Lines v. Cablevision Sys. Corp.*,

15 2005 WL 2305010, *4 (E.D.N.Y. Sept. 21, 2005).

16      The DLA counterplaintiffs' concern that they would be treated differently under New York law

17 is misplaced.  Both states define defamation nearly identically and both states look to the essence of the

18 allegations, not mere labels, to determine whether to treat a claim as defamation even though it is not

19 labeled as such.  *Compare Celle v. Filipino Reporter Enters., Inc.,* 209 F.3d 163, 176 (2d Cir.2000) ("A

20 claim for defamation is actionable under New York law if the defendant made (i) a false and (ii)

21 defamatory (iii) statement of fact (iv) of and concerning the plaintiff (v) with the required degree of fault

22 and (vi) special damages or *per se* liability), *with Harkonen v. Fleming*, 880 F. Supp. 2d 1071, 1078-79

23 (N.D. Cal. 2012) (citing *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999)) (defamation is "(1) the

24 intentional publication" of (2) "a statement of fact" that (3) is "false" (4) "unprivileged," and (5) "has

25 a natural tendency to injure or which causes special damage.").  Thus, whether under California law or

26 New York law, the Court would apply essentially the same test and analyze nearly the same elements.

27 Even were the Court to treat the DLA counterplaintiffs' claims precisely as they are labeled, instead of

28 treating them as defamation, other than variances in the statute of limitations that are not at issue here,

1    New York and California would treat tortious interference with contracts, tortious interference with

2    prospective business advantage, or commercial disparagement congruently.

3            Having determined that the laws of the two jurisdictions do not differ materially, the Court need

4    not discuss the other factors in the choice of law test.  Here, the DLA counterplaintiffs have not made

5    the threshold showing and therefore the Court declines to apply New York law to their claims – whether

6    construed as defamation or as they are facially labeled.

7

8            **2.      DLA and Lerner's Counterclaims**

9            Once the Piping Rock counterdefendants have met their burden of showing that the counterclaim

10   arises from an act in furtherance of their rights of petition or free speech, to survive the motion to strike

11   Piping Rock must next demonstrate a probability of prevailing on each element of the three tort claims

12   asserted.

13           The DLA counterplaintiffs allege that they were injured by the following twelve statements[7]

14   Germain posted on the REIT Wrecks website:

15           Statement 1: DLA alleges that, on January 29, 2010, Germain responded to a holder of
             Apple REITs: "[y]ou should run for the hills, as fast as you can. Your best option is to
16           try to get DLA or Apple or both to buy the shares back from you at $11 per share, and
             threaten legal action if they won't. Another option would be to sell your shares to one
17           of a number of brokers that make a secondary market in these shares (see How to Sell
             Non-Traded REITs), but I think they will likely offer even less than the true value of the
18           shares." Counterclaim, ¶ 17.

19           Statement 2: DLA alleges that, on January 29, 2010, Germain stated that Apple REITs
             are "nothing more than a ponzi scheme – nothing more, nothing less."  *Id*. ¶ 18.
20
             Statement 3: DLA alleges that, on January 29, 2010, "Germain asserted that DLA
21           chooses its customers based on whether 'they . . . manage to see through [DLA's] double
             talk.'"*Id*.  ¶ 18.
22
             Statement 4: DLA alleges that, on July 11, 2011, Germain wrote that"DLA has earned
23           over $600 million in commission from selling these pigs. . . Truly you'd be better off
             playing roulette in Atlantic City than 'investing' your money with either of these two
24           grifters."  *Id*. ¶ 22.

25           Statement 5: DLA alleges that, on January 6, 2011, Germain referred to DLA as
             "hucksters." DLA *Id*. ¶ 23.
26

27           ────────────
                   [7] To the extent DLA bases its counterclaims on statements made by REIT Wrecks users other
28   than Germain, *See* Counterclaim ¶¶ 20, 21, 24-27, Germain is immune from liability for posts he did
     not author under the Communications Decency Act.  *See* 28 U.S.C. § 230; *see also Gentry v. bay, Inc.*,
     99 Cal. App. 4th 816, 828-831 (2002).

                                                     19

1  Statement 6: DLA alleges that, on January 7, 2011, Germain referred to DLA's business as a "flim-flam."*Id*.

2

3  Statement 7: DLA alleges that, on July 2, 2011, Germain characterized the distributions offered by DLA as "fake."*Id*.

4  Statement 8: DLA alleges that, Germain, on June 30, 2011, stated that DLA employees exhibit "deeply sociopathic behavior." *Id*.

5

6  Statement 9: DLA alleges that, on June 15, 2011, Germain stated that DLA is engaged in fraud. *Id*.

7  Statement 10: Germain, on June 15, 2011, stated that DLA is lying to investors. *Id*.

8  Statement 11: DLA alleges that, on January 3, 2011, Germain stated that DLA is "scam[ming]" its customers. *Id*.

9

10  Statement 12: DLA alleges that, on February 3, 2011, Germain stated that, "DLA's products have a 'ponzi-like stench.'" *Id*.

11  The Piping Rock counterdefendants allege that DLA's counterclaims sound in defamation.  The crux

12  of each of the counterclaims is that Piping Rock's speech acts – online postings – caused some

13  economic harm by injuring DLA and Lerner's reputation with the investing community.  Thus, as

14  discussed above, although they are labeled as other torts, the court may analyze them as defamation

15  where that is the gravamen of the complaint.  However, the Court need not address this theory, because

16  the counterplaintiffs have failed to establish the basic elements of the torts that are actually presented

17  on the face of the counterclaim.

18      "In the second prong of the anti-SLAPP analysis the plaintiff's burden of demonstrating a

19  probability of prevailing is subject to a standard similar to that used in deciding a motion for nonsuit,

20  directed verdict, or summary judgment.  The court determines only whether the plaintiff has made a

21  *prima facie* showing of facts that would support a judgment if proved at trial.  We grant the motion if

22  the plaintiff fails to produce evidence to substantiate his claim or if the defendant has shown that the

23  plaintiff cannot prevail as a matter of law."  *Siam v. Kizilbash*, 130 Cal. App. 4th 1563, 1570 (2005)

24  (citations omitted).  Not only must the claims sufficiently state a claim for relief, but the plaintiff must

25  also "introduce substantial evidence of each element on which an ultimate verdict in [its] favor could

26  be affirmed."  *Young v. CBS Broadcasting, Inc.*, 212 Cal. App. 4th 551, 559 (2012).

27

28

a.      **Tortious Interference with Contract.**

Under California law, a claim for tortious interference with contract requires: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55 (1998).

The Piping Rock counterdefendants assert, and the Court agrees, that the DLA counterplaintiffs have failed to show a probability of prevailing on each element of this cause of action. In particular, DLA offers no specific evidence that a contract exists, that the contract was breached or disrupted, or that DLA suffered damages. Instead, DLA offers only vague assertions that Germain's providing advice to DLA customers *must have been intended* to get them to breach a contract. However, DLA offers no evidence to rebut Germain's sworn position that his purpose in posting was to provide "increased transparency and more information for investors" in REITS. Germain Decl. ¶ 11. Lacking any evidence to support most of the elements of the cause of action, the Court concludes that DLA has not met its burden to demonstrate a probability of prevailing on these claims, and accordingly hereby STRIKES the counterclaim for tortious interference with contract.

b.      **Tortious Interference with Prospective Business Advantage.**

Under California law, a cause of action for interference with prospective business advantage requires: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). In addition, the plaintiff must establish that the defendant "engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). To preclude liability based solely on speculation, the California Supreme Court has further required the plaintiff to prove a business relationship with a specific third party

1    containing "the probability of future economic benefit to the plaintiff." *Youst v. Longo*, 43 Cal. 3d 64,

2    71 (1987).

3          The same deficiencies that plague the tortious interference with contract claim also infect this

4    counterclaim. The DLA counterplaintiffs vaguely state that they have "solicited and continue[] to solicit

5    additional investors," DLA Counterclaim, ¶ 38. However, "[a]llegations that amount to a mere hope for

6    an economic relationship and a desire for future benefit are inadequate to satisfy the pleading

7    requirements of the first element of the tort." *Google Inc. v. American Blind & Wallpaper Factory, Inc.*,

8    2005 WL 832398, at *8 (N.D. Cal. Mar. 30, 2005) (relationship with "repeat customers" was too

9    speculative and did not "rise to the level of the requisite promise of future economic advantage").

10   Counterplaintiffs have not identified any specific opportunities that it lost and with which Germain

11   intended to interfere. *See Pinnacle Systems, Inc. v. XOS Technologies, Inc.*, 2003 WL 21397845, at *6

12   (N.D. Cal. May 19, 2003).  There simply is no evidence to rebut Piping Rock's position, that Germain

13   intended to disseminate information, not interfere with any specific business relationships.          The

14   Court concludes that DLA has not met its burden to demonstrate a probability of prevailing on these

15   claims, and accordingly hereby STRIKES the counterclaim for tortious interference with prospective

16   business advantage.

17

18                     **c.      Commercial disparagement.**

19          Under California law, commercial disparagement is the tort known generally as trade libel. *See*

20   *Luxpro Corp. v. Apple Inc.*, 2011 WL 1086027, at *2 fn. 5 (N.D. Cal. March 24, 2011).  Trade

21   libel is the intentional disparagement of the quality of property that results in pecuniary damage to the

22   plaintiff.  *See Nichols v. Great American Ins. Companies*, 169 Cal. App. 3d 766, 773 (1985).  To be

23   actionable, the defamatory statement must be a false statement of fact; statements of opinion alone will

24   not support a cause of action for trade libel.  *See ComputerXpress*, 93 Cal. App. 4th at 1010-11.  To

25   establish trade libel, the plaintiff must plead and prove, first, that the defamatory statement at issue was

26   one "disparaging the quality of [the plaintiff's] property" that the defendant "should recognize is likely

27   to cause pecuniary loss." *Id.* at 1010.  The plaintiff must also prove that the statement played "a material

28

and substantial part in inducing others not to deal with [the plaintiff]." *Erlich v. Etner*, 224 Cal. App. 2d 69, 73 (1964).

The Piping Rock counterdefendants argue that they cannot be held liable for truthful reporting of DLA and Lerner's bad acts. To be sure, there may be First Amendment privilege for the opinions or truthful facts present in the twelve statement at issue. But DLA's cause of action here fails for other reasons, without reaching the First Amendment. A cause of action for trade libel requires pleading and showing special damages. *See Leonardini v. Shell Oil Co.*, 216 Cal. App. 3d 547, 572 (1990) (requiring plaintiff to plead "specific pecuniary loss"). Furthermore, under Fed. R. Civ. P. 9(g) the pleader must state special damages with specificity. Counterplaintiffs must "identify particular customers and transactions of which it was deprived as a result of the libel." *Mann v. Quality Old Time Service, Inc.*, 120 Cal. App. 4th 90, 109 (2004).

At best, the counterclaim contains one vague assertion, "Clients of DLA have redeemed their investments, and some of those clients have informed DLA that the reason they have redeemed their investments is based on negative information they had read on the Internet." Counterclaim ¶ 28. First, "the Internet" is not the same as alleging that they read REIT Wrecks. Thus, it is not even clear if this allegation is connected to counterdefendants' specific website posts. Second, this vague assertion is insufficient to show pecuniary loss. *See Mann*, 120 Cal. App. 4th at 109.

Accordingly, the Court concludes that DLA has not met its burden to demonstrate a probability of prevailing on these claims, and accordingly hereby STRIKES the counterclaim for commercial disparagement.

## CONCLUSION

For the reasons set forth above, the Court DENIES defendants' motion to strike plaintiffs' libel claim and GRANTS plaintiffs' motion to strike DLA and Lerner's counterclaim.

**IT IS SO ORDERED.**

Dated: May 17, 2013

_____
SUSAN ILLSTON
United States District Judge